PAPU JOSEPH SIOFELE, Jr., and SEIGAFOLAVA ROBERT PENE, Petitioners

v.

FRANCIS F.J. SHIMASAKI, Chief Election Officer and BOARD OF REGISTRATION, Election Office of the American Samoa Government, Respondents

High Court of American Samoa
Trial Division

CA No. 105-88

November 3, 1988

4

Before KRUSE, Chief Justice, LUALEMAGA, Associate Judge, and VAIVAO, Associate Judge.

Counsel: Petitioner Papu J. Siofele pro se
Petitioner Seigafolava R. Pene pro se
For Respondents, Caroline B. Crenna, Assistant Attorney General

Petitioners, Papu J. Siofele and Seigafolava R. Pene, seek to run in the upcoming general election for the offices of Governor and Lieutenant Governor respectively.

Respondent Chief Election Officer has found petitioner Siofele ineligible to run for the office of Governor on the determination that petitioner did not satisfy the statutory five year residency requirement. See A.S.C.A. § 4.0102(a)(2). Petitioner Pene has joined in the petition before the Court on the ground that his bid for the office of Lieutenant Governor is dependent on Siofele's eligibility to run for office. A.S.C.A. § 4.0104 requires that the Governor and Lieutenant Governor "shall be elected jointly."

The petition asks for a "Writ of Mandate": 1) directing the Board of Registration to hear petitioner Siofele's appeal from the decision of the Chief Election Officer (the petition seems also to allege that the Chief Election Officer interfered with petitioner's access to the Board of Registration); 2) commanding respondents "to allow petitioners to run for the office of Governor and Lieutenant Governor of American Samoa"; and 3) ordering that the absentee ballot papers reflect petitioners' candidacy. Petitioners further pray for a refund of the their court filing fees and such other relief as the Court deems just and proper.[1]

_____

[1] The petitioners also filed a complaint which sought declaratory and injunctive relief. Although phrased in different terms, the issues raised in that complaint are

5

## Appeal to the Board of Registration

We deny the petition to compel the Board of Registration to take up petitioners' desired appeal. We see nothing in either the Omnibus Local Governor Act of 1977, A.S.C.A. §§ 4.0101 et seq., or in the American Samoa Election Reform Act of 1977, A.S.C.A. §§ 6.0101 et seq., which gives petitioners a right to appeal to the Board of Registration from the Election Officer's determination of ineligibility. Petitioners in their pleadings claim A.S.C.A. § 6.0224 (a) gives them a right to appeal to the Board. Their reliance on this statute is misplaced. This provision provides for appeals to the Board of Registration from decisions of the Chief Election Officer adverse to applications for voter registration or refusing to rectify the register of voters for misspelled names and accidental registration in the wrong voting district pursuant to A.S.C.A. § 6.0220. The section further provides recourse to the Board from the decisions of the Chief Election Officer or district officials ruling on challenges against the registration of any person as a qualified voter. The enactment addresses the "general register and district list[s]" of "qualified elector[s]." A.S.C.A. § 6.0210. It deals only in questions of "elector" qualification and not questions touching on the eligibility of "candidates" for elective office. The succeeding paragraph (b) of section 6.0224 provides that the Board of Registration shall sit on election day, while paragraph (c) thereof provides, inter alia, that if an appeal is sustained, the Board shall so certify to the Election Officer who shall thereupon alter the register accordingly. On the other hand, where the Board disallows an appeal, the affected person may appeal within ten days, directly to the Appellate Division of the High Court. See A.S.C.A. § 6.0230. However pending a decision from the Appellate Division, the appellant's name shall remain or be placed on the register and he or she shall be allowed to vote. That vote shall be sealed and set

---

identical to those raised in the writ proceeding. Thus, our disposition of the writ proceeding serves to dispose of the complaint as well.

aside and then counted or discounted in accordance with the appellate court's decision. A.S.C.A. § 6.0223.[2]

It is obvious from a consideration of the above provisions that the administrative appellate role of the Board of Registration as envisaged by the legislative scheme is not only inconsistent with, but makes no practical sense in, the context of candidacy eligibility appeals. The legislation would be quite meaningless in the practical sense if, for example, we admitted the construction of the enactment to include the possibility of such appeals on election day.[3]

------

[2] Petitioner Siofele explained on the stand that he desired to go before the Board of Registration because this was a condition precedent to his access to the Appellate Division and that if the Board should rule adversely, a pending appeal to the Appellate Division, according to his reading of the statute, would permit his being placed on the ballot. We have been unsuccessful in locating on the books the statutory authority for this proposition and therefore surmise that it stems from a misreading of A.S.C.A. § 6.0223.

[3] Additionally, even assuming for the sake of argument that petitioner had a right to appeal to the Board of Registration, we are unable to find anywhere on the evidence that petitioner had indeed filed an appeal to the Board itself. Petitioner argues that a letter from the respondent Chief Election Officer, denying petitioner's request for reconsideration and advising the petitioner that he has a right to file a complaint with the High Court, was somehow tantamount to a denial from the Board to entertain any appeal. This is assuming too much for our liking. The Election Officer and the Board are two distinct statutory entities and there is nothing in the applicable statute to suggest that the Officer is a sort of gatekeeper to the Board. It would be the height of discretionary abuse for this court to issue its writ to an executive agency to compel that agency to do something it was never asked to do by a complaining party in the first place.

7

The only manner of appeal available to the Board of Registration by petitioner Siofele would be in the context of a decision by the Chief Election Officer to deny his being placed on the general register and district lists of qualified electors. We agree on the evidence with the respondent that petitioner Siofele has not even bothered to register as an elector. The Election Officer testified that a search by his office revealed no application by Siofele to register as a voter. Such applications are made on pre-printed forms which assign a voting number and require the applicant to furnish a number of personal details. These forms are filled out in the election office before an election official and are signed by the applicant before a notary public.

Petitioner Siofele however "believes" that he has so applied. Although he could not positively recall that he had filled out a registration form, he would have the court sustain his belief because an official of the election office requested that he provide his social security number, his birthdate, and other proofs which are the sort of details required by the voter registration form. We are not prepared to draw such an inference in light of the Election Officer's evidence and also in light of the fact that a person's social security number and other proofs of identity are also the sort of detail required in the questionnaires to be filled out by candidates. Such questionnaires were filled out and supplied by petitioner. Further, this petitioner had earlier this year sought mandamus to compel the respondent Election Officer to register petitioner's name on the register. The court in denying mandamus found that petitioner had indeed failed to register to vote. Siofele v. Shimasaki, CA No. 79-88, Opinion and Order on "Petition for Writ of Mandate," (August 29, 1988) [8 A.S.R. 81 (1988)]. Thus petitioner was clearly counseled on registration proceedings and appeals therefrom. Given the short intervening span of time between that decision and petitioner's testimony in this court, petitioner's inability to recall whether or not he had applied to vote simply lacks reliability.

8

## Appeals from Adverse Determination on Eligibility

We turn to appeals from the Chief Election Officer's adverse determination of petitioner's eligibility to run for office. The authority for the Chief Election Officer to make this determination is found in A.S.C.A § 6.0301(d). Siofele v. Shimasaki, supra. The election related enactments are silent on any specific procedure to appeal a determination of a candidate's ineligibility to run, although direct appeal to the Appellate Division is provided for in election contest cases. A.S.C.A. § 6.0903. We grant review in the nature of mandamus given the urgent nature of the circumstances and hence the questionable adequacy of any alternative review procedures which might otherwise be available. T.C.R.C.P. Rules 87 & 88.

Petitioners seek an order compelling the respondents to permit their running for office and to prepare the ballots accordingly for distribution. If appropriate, mandamus would lie only against the Chief Election Officer since he alone is charged by statute with determining whether a nominated candidate is eligible to run for office and with preparing the ballot papers accordingly. A.S.C.A. § 6.0301(d). We therefore deny relief as against the other respondents.

Since underlying questions of fact were raised, the Court conducted an evidentiary hearing. T.C.R.C.P. Rule 94 provides for an alternative writ in the manner of a show cause order directed to the appropriate respondent. See also T.C.R.C.P. Rule 96.

As we noted at the outset, the Chief Election Officer had determined petitioner Siofele ineligible for election to the office of Governor because of the statutory five year residency requirement. The evidence disclosed that on or about September 15, 1988, the petitioner had presented to the election office a completed questionnaire detailing among other things his residency in the territory during the years 1983 to 1988. His noted occupation during these times is "Writer/Student" and petitioner holds himself out as being a resident of Tualauta County. The Chief Election Officer testified that Siofele was not on the current voter registration lists (Siofele

admitted on the stand that he was last on the territorial register in 1977), and, that in connection with Siofele's nomination filings, he had requested Siofele to supply routine proofs of residency in the territory over the past five years. The sort of things asked for were local utility bills and evidence of being a local taxpayer. These were not supplied by petitioner. Petitioner was not in fact in the territory during those years. Knowing that, the Election Officer also requested petitioner to supply the address he had lived at while in the United States. According to the respondent Election Officer, petitioner refused to supply both that address and any evidence that petitioner was still attending school while absent from the territory. The respondent further testified that he obtained some information that petitioner lived in Riverside, California and he thus contacted that county's Registrar of Voters. Respondent received a certified copy of an affidavit of registration which named Joe Siofele as being a registered voter of that county. The affidavit bears the date 10/18/85. By letter dated September 23, 1988, the respondent advised petitioner of his receipt of the said affidavit of registration and his conclusion that at least as of October, 1985, petitioner was a resident of California and therefore unqualified to run for the governorship.

By this time, petitioner Siofele had departed for the United States. On September 25, 1988 a letter signed on petitioner's behalf by Seigafolava Pene was sent to the Chief Election Officer requesting a copy of the affidavit of registration. The request was complied with under cover letter of September 27, 1988. The following day, September 28, 1988, Mr. Pene sent another letter, "as running mate of Mr. Papu Joseph Siofele Jr.," to the Chief Election Officer seeking the latter's reconsideration of his decision of September 23, 1988. It appears that in the mutual spirit of expediting things the Election Officer by return letter of September 29, 1988, promptly notified Mr. Pene that the decision about Mr. Siofele's eligibility was final and that further action should be taken up in the High Court.

The next encounter on record between the parties is a letter dated October 25, 1988 from petitioner Siofele, who had by then returned on island, to the Chief Election Officer responding to

the latter's denial of petitioner's request for reconsideration and advising respondent that petitioner's absence was owing to a tragic death in his family. Additionally, petitioner tendered "documents to clear my name." On the testimony, these documents were identified as: a certified copy of the same affidavit of registration from Riverside County but with an added notation that it had been "Cancelled" "[b]y request" as of September, 1988; and an illegible copy of what Mr. Siofele testified was his Riverside registration affidavit of 1981. In addition, petitioners submitted a sealed letter dated September 30, 1988, from the Riverside County Registrar of Voters stating that "Papu Joseph Siofele was registered in Riverside County May 28, 1981, and was cancelled November of 1983 because he did not vote. He registered again in October of 1985, and never voted." This letter was not, according to the Chief Election Officer, shown him until he was on the witness stand.

Notwithstanding this additional information, the Chief Election Officer was unmoved. While he could not exactly remember the day, he had by now printed the ballots.

On October 28, 1988, only ten business days prior to the scheduled election day, petitioners filed for a writ of mandate.

The authorities are replete with statements that "mandamus" lies to compel the performance of a ministerial act or mandatory duty where petitioner has a specific, well defined legal right; respondent has a corresponding specific, well defined duty; and there is a want of any other appropriate and adequate remedy. Given this statement of the law and looking to the pertinent enactments upon which the claimed right, and thus reciprocal duty, is based, petitioner Siofele's claims of right to run for elective office are dependent on his satisfying a number of conditions, including being a bona fide resident of the territory for the past five years. At the continuing risk of overstating the obvious, the only specific and well defined requirement in the enactments is the duty imposed on the Chief Election Officer to determine the eligibility of a candidate for elective office. A.S.C.A. § 6.0301 (d). The Chief Election Officer has apparently done this. The question which therefore follows

11

is whether he has made this determination in accordance with law.

We find on the evidence that the Chief Election Officer has shown sufficient cause to find and therefore act as he did. At the outset he had doubts about petitioner Siofele's residency as the latter had sought nomination forms but was absent from the general register of qualified electors. He had sought proofs of residency from the petitioner who inexplicably proved to be uncooperative even to the point of refusing to reveal his United States address. We assume that there is a burden on any candidate for elective office to supply such meaningful proofs as to permit the Chief Election Officer to discharge his duties beyond the perfunctory level if there is to be any proper implementation of the Omnibus Local Governor Act and the American Samoa Electoral Reform Act. In this regard we find ourselves far from impressed with petitioner Siofele's rather feeble entreaty to the effect that his furnishing of information sought by the various forms supplied by the election office suffices to satisfy eligibility requirements. To the contrary, we find a heavier burden embodied in the territory's pertinent election statutes than that mere measure of formality that petitioner would have us believe suffices to establish eligibility to be a gubernatorial candidate. In connection herewith, we find no basis to sustain petitioner's allusions on the stand to arbitrary treatment and caprice on the part of the election office.

Additionally, petitioner's explanation of the 1985 registration form to the Election Officer was not necessarily sufficient to compel the officer to conclude in petitioner's favor. In seeking to dismiss the significance of the 1985 Riverside registration form, petitioner related on the stand his explanation to the respondent Election Officer. Petitioner denied any knowledge of the 1985 registration, which he suspected was filled out and signed on his behalf by his overly exuberant son who was very active with him in the 1982 Riverside election campaigns. Petitioner directed attention to an actual error with his birthdate on the affidavit of registration, stating this was hardly a matter that he should lie about. He also pointed to the letter of September 30, 1988 from the Riverside County Registrar of Voters to corroborate his testimony that the last time he voted in

12

Riverside was in 1982 as his registration was cancelled the following year because of his non-voting.

We cannot say on this showing that an official charged with the responsibilities of the Chief Election Officer when confronted with the total evidentiary picture above must necessarily conclude in favor of petitioner. Firstly, the corroborative letter of September 30, 1988 from Riverside, which was not originally made available to the respondent, corroborates petitioner's claim only in part. The letter also certifies petitioner's disavowed registration of 1985. The Chief Election Officer seems to have considered the claimed forgery of the 1985 registration and to have been justified in refusing to believe petitioner. Secondly, on the lack of information provided by the petitioner as to the status of his schooling which would avail him a statutory exception to physical residence in the normal course, see A.S.C.A. § 4.0102(b)(4), petitioner quite candidly admitted on the witness stand that he had completed his bachelor of laws in 1980, and that he was currently writing a book. These are not the sort of circumstances which compels a conclusion of "bona fide" residency as required of candidates for governor let alone a basis to issue a mandate to the Chief Election Officer that he has a "specific and well defined duty" to conclude in favor of petitioner's eligibility and to amend the ballot papers accordingly.[4]

---

[4] We note two additional points. First of all, although the parties' discussion of the residency issue turned on whether the 1985 registration was authentic, petitioner would not necessarily have been entitled to relief even if the registration were forged. Residence is a matter of where one has fixed his habitation and intends to return upon being away from that habitation. A.S.C.A. § 6.0212(a). Without an affirmative showing by petitioner of those additional factors which would explain his lengthy physical absence from the territory, we could not have issued the writ. Secondly, the petitioner sought a writ of mandate without demonstrating that besides the residency question he was otherwise eligible according to the statutory criteria to be a candidate for Governor. It

13

## Undue Delay

Under the facts presented, petitioners failed on substantive grounds to show their eligibility for relief. However, even were they otherwise entitled to a writ of mandate, this court would not issue the writ because of petitioners' unreasonable delay in bringing this proceeding.

Although laches is technically an equitable defense, and a writ technically a proceeding at law, it has been held that laches applies in petitions for mandamus. State ex rel. Fisher v. Brown, 289 N.E.2d 349, 351 (Ohio 1972). See also State ex rel. Krupa v. Green, 177 N.E.2d 418 (Ohio App. 1961) (writ of prohibition).[5] Respondents have shown the classic elements of laches --- an unreasonable delay in the assertion of their rights by one party and undue prejudice to the other party. Gardner v. Panama Railroad Co., 342 U.S. 29, 31 (1951).

From September 29 to October 25 petitioners did nothing in the courts or in the election office to advance their rights. A one month delay in asserting one's rights is not necessarily unreasonable. But, such a delay becomes unreasonable when we consider that the election was to be held only two weeks after petitioners first sought to invoke the court's aid in their attempts to be placed on the ballot and that although petitioner Siofele was understandably absent from the territory, he could have secured counsel or instructed petitioner Pene to press their rights,

was unclear on the evidence before us that these other criteria had been satisfied by petitioner. The extent of our record does not permit this court to issue its mandate to the Election Officer.

[5] Even if there were no authority for the proposition that laches may attach in a writ proceeding we would reach the same result. An extraordinary writ issues at the discretion of the court. In the exercise of that discretion, we find that the undue delay of the petitioners is sufficient reason to deny them the extraordinary relief they seek.

14

as, indeed, Pene had done earlier. One cannot wait until the last minute to assert rights when to do so causes prejudice to another. We take judicial notice of the undue prejudice which petitioners' inaction would cause the government. With the election but one week away, reprinting the ballots in time to send them out to the districts and absentee voters, if possible at all, would constitute a significant expense that would not have been incurred had petitioners acted promptly upon receiving the Election Officer's letter of September 29.

We deny extraordinary relief and petitioners' claim for costs.

It is so Ordered.